648 P.2d 1119

**Lucy Hay ROSS, Plaintiff-Respondent and Cross-Appellant,**

v.

**John D. ROSS, Defendant-Appellant and Cross-Respondent.**

**Lucy Hay ROSS, Plaintiff-Appellant,**

v.

**John D. ROSS, Defendant-Respondent.**

**Lucy Hay ROSS, Plaintiff-Respondent,**

v.

**John D. ROSS, Defendant-Appellant.**

**Nos. 12980, 13260 and 13265.**

Supreme Court of Idaho.

April 28, 1982.

Dean E. Miller of Gigray, Miller, Downen & Weston, Caldwell, for John D. Ross.

Fred Kennedy of Kennedy, Thomas, Sasser & Hamlin, Boise, for Lucy Hay Ross.

DONALDSON, Justice.

These are appeals and cross-appeals from various rulings of the trial court in a divorce proceeding. We affirm in part, reverse in part, and remand for further proceedings.

Lucy Hay Ross (hereinafter plaintiff) and John D. Ross (hereinafter defendant) were married in 1953 and had three children, one of whom was fifteen years old at the time of the divorce and was in the custody of the plaintiff.

Defendant is a physician with a specialty in ophthalmology and had so practiced for approximately ten years at the date of the divorce. In 1975, defendant earned approximately $100,000 from his medical practice. The parties had accumulated community property valued at approximately $617,000.

Plaintiff filed for divorce in March, 1976, on the grounds of adultery and extreme cruelty. Defendant admitted the allegation of extreme cruelty but denied the allegation of adultery and filed a counterclaim for divorce on the grounds of irreconcilable differences.

Defendant then moved for partial summary judgment on the divorce issue only. At the hearing plaintiff did not resist the granting of divorce, but rather argued that a partial summary judgment for divorce should be granted to her, rather than the husband, on her grounds of adultery or extreme cruelty. The court entered what was denominated "Order for Partial Summary Judgment and Judgment of Divorce." The court ordered that the marriage be dissolved, but that additional questions concerning alimony, the division of property, and the custody and support of the minor child, be reserved for trial. The court first granted the divorce on grounds of irreconcilable differences, but on plaintiff's motion and after further argument changed the grounds to extreme cruelty.

Plaintiff later moved to vacate the partial summary judgment and also moved for a new trial on the basis of mistake, inadvertence, surprise, or excusable neglect in failing to file affidavits or authorities in opposition to the motion for summary judgment. On October 15, 1976, defendant, by way of opposition to plaintiff's motion to vacate the summary judgment, filed an affidavit stating that he had remarried. On that same date a hearing was held and the motions were denied.

Trial began upon the remaining issues on March 14, 1977, following which the trial court entered its findings of fact, conclusions of law, and decree. The court found *inter alia* that defendant had inflicted extreme cruelty on plaintiff; that the evidence was not sufficiently clear and convincing to constitute proof of adultery by defendant; that the net community property value was $617,120, and that an equal division of the property was fair, reasonable and just, and would result in the least adverse tax consequences to the parties; that defendant must pay $30,000 per year to plaintiff as alimony for her lifetime (that alimony provision was later modified to require alimony at $30,000 per year for five years, $24,000 for the sixth year, $18,000 for the seventh year, $12,000 for the eighth year, $6,000 for the ninth year, and thereafter alimony to cease); that defendant must pay plaintiff the sum of $150 per month for child support; that defendant must sell the parties' residence and their interest in a farm partnership and pay to plaintiff the sum of approximately $151,000 "directly from the proceeds of said sales;" that defendant must pay all tax liability resulting from income from the community property, together with all tax liability upon the personal income of the defendant "through the date of plaintiff's divorce from the defendant" and all taxes that might arise from the sale of the residence and the farm partnership; that defendant must pay his own attorney fees, with plaintiff to pay the first $12,500 of her attorney fees, and defendant to pay the remainder thereof of approximately $6,000. Finally, plaintiff was granted a divorce upon the ground of extreme cruelty *"nunc pro tunc* and of record as of September 20, 1976." Since we affirm the summary judgment this issue is moot.[1]

Plaintiff first asserts that the trial court erred in entering a partial summary judgment and decree of divorce, reserving additional issues for later trial. In *Newell v. Newell,* 77 Idaho 355, 362, 293 P.2d 663, 667 (1956), *cert. denied,* 352 U.S. 871, 77 S.Ct. 95, 1 L.Ed.2d 76 (1956), we held that "[t]he divorce laws of Idaho make no provision for an interlocutory judgment of divorce, . . ." However, subsequent to *Newell,* Idaho adopted the Federal Rules of Civil Procedure. I.R.C.P. 56(a) now permits judgment "upon all or *any part"* of a claim. (Emphasis added.) Even though the trial court did not certify the partial summary judgment as final as required in I.R.C.P. 54(b), for the reasons stated below, we nonetheless hold that following the principles of quasi estoppel plaintiff is estopped from alleging that error occurred in the trial court's granting of the decree of divorce.

Concerning quasi estoppel this Court has stated,

"To constitute quasi estoppel, the person against whom the estoppel is sought must have gained some advantage for himself, produced some disadvantage to the person seeking the estoppel, or induced such party to change his position; in addition it must be unconscionable to allow the person against whom the estoppel is sought to maintain a position which is inconsistent with the one in which he accepted a benefit. *Dawson v. Mead,* 98 Idaho 1, 557 P.2d 595 (1976); *KTVB, Inc. v. Boise City,* 94 Idaho 279, 486 P.2d 992 (1971)." *Tommerup v. Albertson's Inc.,* 101 Idaho 1, 6, 607 P.2d 1055, 1060 (1980).

Firstly, it was plaintiff who filed for the divorce, and as stated previously she argued at the summary judgment hearing on September 20, 1976, that the divorce should be granted. This divorce, which was granted on the grounds argued by plaintiff, allowed

---

1. The Court does not approve of the use of "nunc pro tunc" concept in this context. However, in this particular case it is immaterial because the trial court entered the partial summary judgment terminating the marriage between the parties and this Court is recognizing (*See* infra,) the validity and finality of that decree by holding that the plaintiff is estopped from claiming error in the granting of the decree of divorce by partial summary judgment. Therefore, it was unnecessary for the trial court in the final decree to relate the property division decree or divorce decree back to September 21, 1976.

her to be rid of her husband which she wanted, and thus conferred a benefit, and also allowed defendant to change his position in that he remarried on September 21, 1976.

Secondly, plaintiff has taken advantage of the favorable provisions of the judgment. She has received large amounts of property, has had repeated executions issued on the judgment and received approximately $67,000 in cash in settlement of certain of those executions and she is now seeking to maintain a position which is inconsistent with the one in which she accepted those benefits. *See Culbertson v. Culbertson,* 91 Nev. 230, 533 P.2d 768 (1975).

This case is similar to *Willis v. Willis,* 93 Idaho 261, 460 P.2d 396 (1969). In *Willis,* the wife attempted to vacate the decree under I.R.C.P. 60(b). This Court stated:

"Additionally, appellant has accepted all the benefits of the divorce decree and the provisions of the property settlement agreement. So far as the record is concerned there is no showing she made any offer or tender to restore or return any of the property or funds, except upon a court ordered recission of the agreement and under such circumstances the court looks with disfavor upon a motion for relief under Rule 60(b)." *Id.* at 265, 460 P.2d at 400.

Because plaintiff initially sought the divorce and argued that a divorce should be granted to her, and the entry of the decree enabled defendant to remarry, as he did, and the plaintiff took advantage of the favorable provisions of the decree of divorce, we hold that it is unconscionable for her to now maintain an inconsistent position, and therefore, she is estopped to deny its validity.

■ Plaintiff also asserts that the trial court erred in its conclusion that the evidence was insufficient upon which to base a finding of adultery by the defendant. Divorces based on adultery should be granted only upon very clear and conclusive evidence of the adultery. *E.g., Leonard v. Leonard,* 88 Idaho 485, 401 P.2d 541 (1965). The record before us supports the conclusion of the trial court that plaintiff failed to carry the burden of proof of adultery.

■ Plaintiff next asserts that the trial court erred in its award of child support. Plaintiff argues that the court award of $150 per month was inadequate and that the child support award should have been at least $200 per month. Child support awards rest in the sound discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. *E.g., Fuller v. Fuller,* 101 Idaho 40, 607 P.2d 1314 (1980). Here, considering the circumstances of the parties and the finances available, the trial court's award of child support was certainly modest. However, considering the finances available to plaintiff the trial court may well have concluded, and justifiably so, that both parents were able to and should participate in the support of the minor child. We find no abuse of discretion.

■ Defendant asserts error in that portion of the court's order requiring him to pay all of plaintiff's attorney fees above the amount of $12,583 incurred during the divorce and property settlement proceedings. This amounted to approximately $6,000. It is asserted that the trial court erred in awarding those attorney fees after the community property had been divided. We agree.

"We have ruled that the proper manner of carrying out the mandate of this section [I.C. §§ 32–708, 32–704] is to satisfy the community debts, then the wife's temporary support and attorney fees, from the total property owned by the community *before equitable division of the proeprty.*" *Mifflin v. Mifflin,* 97 Idaho 895, 897, 556 P.2d 854, 856 (1976) (emphasis in original). In the instant case, the trial court erred in failing to satisfy the award of attorney fees from the total property owned by the community before dividing that property.

■ Defendant also asserts that the trial court erred in ordering him to pay $2,000 of the $5,000 attorney fees incurred by plaintiff during post-trial motions. Under I.C. § 32–704 after entry of a judgment, where a former wife has access to and control of

**410**

her share of the community property, an award of attorney fees cannot be characterized as an award of "money *necessary* to enable the wife ... to prosecute or defend the action." *Parker v. Parker*, 97 Idaho 209, 215, 541 P.2d 1177, 1183 (1975) (emphasis in original). In the instant case, plaintiff, by judgment, had been awarded over $300,000 of the community property, and as the trial court stated in its order, "substantial portions of the plaintiff's share of the community property of the parties have been delivered to and are now under the exclusive possession and control of the plaintiff ...." Thus, we hold that the trial court erred in requiring defendant to pay $2,000 of plaintiff's attorney fees incurred after judgment had been rendered.[2]

■ Defendant asserts that the trial court made two errors in its property division determination. First, he argues that the trial court over-valued the parties' residence. An appraiser for plaintiff testified to a value of $115,000, while that of defendant's appraiser valued the home at $95,000. The court adopted the $115,000 value. The valuation of any property is a relatively imprecise procedure and the trial court must make the ultimate determination as between conflicting values submitted by different appraisers. *E.g., Chugg v. Chugg*, 94 Idaho 45, 480 P.2d 891 (1971). The valuation of the residence in the instant case is not clearly erroneous, being supported by substantial, competent, although conflicting, evidence, and will not be disturbed on appeal. I.R.C.P. 52(a).

■ Defendant also asserts error in the trial court's order requiring him to sell the residence and a farming partnership and distribute $151,765 of the sale proceeds to the plaintiff. Defendant argues that the court should have either divided the sales proceeds equally or awarded the home to the wife and the partnership to the husband. Ordinarily, the better practice would be for the court to do as suggested by defendant, but under the facts and circumstances in this case we agree with the trial court. Where, as here, a divorce is decreed upon the ground of extreme cruelty, the community property must be assigned the proportions that the trial judge deems just. I.C. § 32–712(1). A trial court thus has wide discretion in dividing the community property and its determination will not be disturbed absent a clear showing of abuse of discretion. *E.g., Simplot v. Simplot*, 96 Idaho 239, 526 P.2d 844 (1974).

■ Because plaintiff was moving to South Carolina and did not want the house, and would be unable to supervise the sale of the home or the partnership interest, we find no abuse of discretion in the trial court's awarding the home and partnership interest to the husband and then ordering him to sell the property. Also, under the facts of this case, we find no abuse of discretion in the trial court's order that the husband pay the wife a predetermined sum of the proceeds to insure her of receiving at least one-half of the value of the property.

Defendant also argues that the trial court abused its discretion in granting alimony to plaintiff in view of the substantial sum awarded to her in the property division.[3] In addition, he claims that the alimony award reflects an inadequate consideration of tax consequences, because it was awarded for less than ten years. *See* 26 U.S.C. §§ 71, 215 (1954). Pending the outcome of this appeal, defendant has been paying plaintiff $2,000 per month pursuant to stipulation.

---

2. *Mifflin v. Mifflin, supra,* is dispositive as to resort to community property for the payment of attorney fees incurred *prior to a divorce decree.*

3. The constitutionality of I.C. § 32–706, upon which the alimony award is based, was not raised on appeal. In fact, the defendant-appellant in a reply brief stated, "We want the record to be absolutely clear, first, that the husband did not raise the constitutional issue of *Orr v. Orr* in the trial court; second, that the husband has not heretofore raised it on appeal; and third, the husband does not raise it on appeal." Consequently, we do not decide that issue. *Oregon Shortline R.R. Co. v. City of Chubbuck*, 93 Idaho 815, 816, 474 P.2d 244, 245 (1970).

■ The standard to be applied in awarding alimony requires the district court to give due consideration to the correlative needs and abilities of both parties. *Mifflin v. Mifflin*, 97 Idaho 895, 556 P.2d 854 (1976). As stated in *Mifflin* a decision denying or awarding alimony to a party "will not be overturned by this Court in the absence of an abuse of discretion." *Id.* at 898, 556 P.2d 854 (*citing Loveland v. Loveland*, 91 Idaho 400, 422 P.2d 67 (1967)).

■ After reviewing the record in this case we find that the trial court abused its discretion in awarding to plaintiff $210,000 in alimony over a nine-year period since there was no showing of need. Alimony is not awarded to the wife as a matter of right but only at the discretion of the trial court after a showing of need. *Mifflin, supra; Wyatt v. Wyatt*, 95 Idaho 391, 509 P.2d 1312 (1973); *McNett v. McNett*, 95 Idaho 59, 501 P.2d 1059 (1972). The plaintiff's share of the community property was worth over $300,000. She also testified that her necessary expenses were approximately $875 per month. The trial court found that plaintiff was a college graduate, capable of obtaining employment with additional education at a cost of approximately $3,600. Thus, while temporary alimony could be justified while plaintiff was going back to school and had custody of the minor child who is now of majority, it cannot be justified in the amount of $210,000 paid over a nine-year period. This is particularly true when the trial court found that with prudent management of the over $300,000 worth of assets plaintiff could live comfortably on the income from her assets. Therefore, we reverse the trial court's award of $210,000 in alimony and remand to the district court for it to determine if the division of the property is still "fair and equitable" in view of the fact that plaintiff will not be receiving alimony. What may have been a "just and equitable division" of the community property in the mind of the trial judge may well have been influenced by the additional $210,000 which he decreed to plaintiff as alimony. The statute permits any division of the community property which the trial judge considers just under all the cir-cumstances, I.C. § 32–712, and we deem it desirable to allow the trial judge to make that determination rather than usurping his discretion at this level.

The total amount of alimony awarded, *i.e.*, $210,000, is in our opinion excessive. However, the plaintiff has been paying pursuant to stipulation and order of the district court $2,000 per month temporary support during the pendency of this action and these payments may continue until entry of final judgment in the district court. Thereafter, the $2,000 per month paid pending determination of the action should cease, and no permanent alimony pursuant to I.C. § 32–706 should be awarded.

We have reviewed all the other issues raised by the parties and find that the rulings of the trial court are otherwise supported by the evidence and are not in error. The judgment and orders of the court below are therefore affirmed in all respects, except as indicated above.

The court below denied plaintiff an advance of attorney fees to pursue this appeal, finding such an advance not to be "necessary" under I.C. § 32–704. Although the final determination of whether attorney fees should be awarded on appeal rests with this Court, I.A.R. 41, we adopt in this case the findings of the district court that plaintiff had adequate funds in her possession to prosecute this appeal. Consequently, we award no attorney fees under I.C. § 32–704. *Parker v. Parker*, 97 Idaho 209, 541 P.2d 1177 (1975); *Tolman v. Tolman*, 93 Idaho 374, 461 P.2d 433 (1969).

The case is affirmed in part, reversed in part, and remanded for the limited proceedings described herein.

No costs allowed.

McFADDEN and SHEPARD, JJ., concur.

BISTLINE, Justice, concurring and dissenting:

I.

On the matter of the permanent alimony award I take my bearings from the wisdom

of Justice Knudson who authored the Court's opinion in *Nielsen v. Nielsen*, 87 Idaho 578, 394 P.2d 625 (1964). Dr. Nielsen by the final decree in that case was ordered to pay $100 child support for each of two children, and ordered to pay Mrs. Nielsen $200 per month as alimony for a period of one year. Mrs. Nielsen challenged on appeal both the amount and the time limitation. A unanimous Court through Justice Knudson responded to Mrs. Nielsen's contentions as follows:

"The portion of the court's findings which discloses to some extent the reasoning of the court in limiting the payments to one year is as follows:

'That the plaintiff has the intelligence and education to enable her to find and hold employment during the hours the children are in school, and the Court further finds that such employment would be to her best interest from a mental standpoint.'

"The record does indicate that many of appellant's personal problems were a result of her remaining at home and worrying; the trial court considered that it would be to her best interest from a mental standpoint to accept employment. In considering appellant's contention it is of significance to note that the trial court also found:

'That the plaintiff is at present unemployed and her present physical and mental condition is not of the best, and that this has been caused in the main by defendant's conduct and treatment of her, and as a result thereof, the plaintiff is entitled to receive, and the defendant shall pay to the plaintiff, the sum of $200.00 per month as alimony for a period of one year, beginning June 1, 1963.'

As concerns the adequacy of the amount of the allowance we disagree with appellant's contention. We are not aware of any showing that appellant cannot provide herself and the children with appropriate maintenance with the allowances prescribed. However, under all the circumstances of this case we consider that it was error to limit the alimony pay-

ments to a period of one year. The court recognized that at the time the decree was entered appellant was not well physically or mentally. There is no showing that appellant has been able to procure employment at any time 'during the hours the children are at school.' These children may be adversely affected by appellant's absence from the home while in pursuit of employment, and in view of the tender ages of said children it is important to consider what effect would result. *To terminate the alimony in advance of any showing that circumstances warrant such termination would necessarily rest on speculation or conjecture.*" 87 Idaho at 585–86, 394 P.2d at 629 (emphasis added).

The logic of that analysis is applicable here and persuades me that it should be controlling. Particularly, just as the Court then held that it was error to forecast a termination date of one year, so was it error on the part of the district court here to adopt a termination date of nine years. It was necessarily resting "on speculation and conjecture." Equally speculative was the court's forecast of the dates the alimony would be reduced.

Accepting the fact that the court saw a need for an alimony award at the time the decree was entered, it was improper to extend its duration for nine years. That provision made it imperative that defendant-husband appeal—else he would later face the plea in bar of res judicata if he sought modification at the trial court level. The law is not all that clear, perhaps, but it is certainly arguable that the alimony award was intended to be permanent for a nine years period, even though not granted in lump sum form. The award should have been for a monthly amount for the two years, or three at the most, which might have then been found necessary, with a proviso that there then be an automatic re-examination of Mrs. Ross's needs. Monthly alimony at the least should have been made subject to modification on motion by either party. As stated in *Nielsen*, "until such time as it is shown to the court

that [she] is no longer in need of the alimony or that circumstances and conditions of the parties warrant a modification, the payment should continue." *Id.* at 586, 394 P.2d at 629. One year was there held to be too short a time without allowing for a re-evaluation of the situation, and conversely the nine year award in this case is too long. There should have been a provision for an earlier re-evaluation; without such defendant was forced to initiate this appeal.

As the Court's opinion points out, Dr. Ross agreed to pay $2,000 monthly as alimony *pendente lite*—while the appeal was processed to test out, amongst other things, primarily the validity of the alimony award. The opinion as written lends itself to the inference that this was a voluntary agreement upon the part of the defendant. It certainly is true that he did agree to do it. But it is at once seen as enigmatic that he would voluntarily agree to giving his ex-wife the sum of $2,000 monthly while awaiting disposition of the appeal, and at the same time contend, as he does and has, that he should have been ordered to pay no alimony. At the present time he presumably has written forty-eight $2,000 checks to Mrs. Ross—amounting to a total of $96,000—which is almost one-half of the total permanent alimony award. Under the rationale today adopted in the Court's opinion, if another four years elapsed before there was a final judgment, the contention that he should not be obligated to pay any alimony would be rendered moot.

The inference to be clearly drawn from the record is that the defendant reached the agreement with the plaintiff (it was not a unilateral beneficience of an eleemosynary nature) to pay and accept the $2,000 monthly as an alternative solution to his being faced with writs of execution as every month placed him another $2,500 in debt. So viewed the agreement would in this Court be nothing more than a matter of passing interest. If the permanent alimony award is to be set aside, and a majority of the Court say that it is, the trial court would seem to be the only proper forum for resolution of the status of the $2,000 payments heretofore made. I would imagine

that counsel for defendant could for quite a distance be heard objecting to any suggestion that the defendant, with whom he has counsel, had agreed to paying *that much* of the permanent alimony award, and no strings attached. It appears that the parties, through counsel, worked out an agreement to avoid executions and avoid as well the cost of a supersedeas bond which, as all of the older practitioners know, makes a good premium for surety companies, and usually at no risk—but can also be a huge taxable cost if the party putting up the bond prevails on the appeal. A question arises as to how much of this is surmise on my part, or how much is inferable from the record.

The parties, both represented by able counsel, seem to me to have understood that Dr. Ross could post a supersedeas bond, and that if he did do so, Mrs. Ross would have been prevented from executing on each accruing $2,500 monthly installment. But that is not all. She would now find herself, as the non-prevailing party on appeal, assessed as taxable costs the annual premiums for the supersedeas bond, assuming that I correctly read the Court's opinion as denying her any permanent alimony whatever. I note also that in *Industrial Leasing Corp. v. Thomason*, 96 Idaho 574, 532 P.2d 916 (1974), on file with the clerk of this Court, the cost bill shows that a total sum of $1,625 for two years of premiums was paid for the supersedeas bond obtained by appellants in that case. *See* I.C. § 41–2607; *Henderson v. Cominco American, Inc.*, 95 Idaho 690, 518 P.2d 873 (1973).

The parties seem to have understood as well that if no bond were posted, or agreement reached in lieu of bond, and Mrs. Ross by execution process exacted $2,500 monthly from Dr. Ross, and the money judgment was later invalidated, she would have been required to make restitution, as well as pay the bond premiums. All considered, I have concluded as above that it would be better for the Court to remain aloof from concerning itself with the agreement made by the parties and the underlying premises therefore, which are better known to them and

to the trial court. I do not intend my remarks to be taken as a prejudgment of district court resolution on the issue. Rather, I strongly believe that this Court should not now on a record sparse as to that issue decide the status of $96,000 which has been paid, or declare the obligation of Dr. Ross to continue payments until a final judgment is entered—which holding may very well have a "chilling effect" on his right to continue with litigation to an outcome which he believes to be fair and just.

The oral in-court agreement which led to the entry of the stay order in district court contained the following recitations which to my mind support the view that this Court ought not concur itself with the $96,000 payments—thereby perhaps falling into an erroneous disposition, and I quote from the minutes of the trial court:

"Mr. Miller represented to the Court that the defendant intends to immediately appeal the Court's decisions in this matter. However, in order to avoid the necessity of repeated executions, orders, and matters of that nature, without prejudice of rights of appeal of either party, and without prejudice of raising any issue on appeal, the defendant is willing at this time to cause there to be delivered to the plaintiff, the following items of property, as set forth in the Findings of Fact on Pages 5 and 6:

| | |
|---|---|
| Cash Value of Life Insurance | $ 3,072.00 |
| Stocks and Bonds in the amount of | 23,073.00 |
| Credit with Merrill, Lynch, Pierce, Fenner & Smith | 1,386.00 |
| Items of Fidelity Federal Savings (is in the plaintiff's possession) | 30,084.00 |

"Mr. Miller further represented to the Court that he is willing to stipulate, on behalf of the defendant, that the Court can make an Order that pending appeal, the defendant pay to the plaintiff, alimony, in the sum of $2,000 per month commencing with the month of April, 1978; That the sum of $3,150 which has been paid by the defendant can be applied to

alimony from December, 1977, and further that defendant would ask the Court for an Order Staying Execution, providing all of these things are done by May 15, 1978."

I believe it is safe to say that there is reason to believe the court's order reciting that "It was further agreed defendant (Dr. Ross) would on or before May 15, 1978, commence to pay to plaintiff the sum of $2,000 a month as alimony pending appeal with the first said payment being due for the month of April, 1978," strongly substantiates an inference that counsel for Dr. Ross was not intending his client as a voluntary donor, but rather would make such payment for the reasons stated by Mr. Miller, according to the court minutes.

The agreement leading to the order for $2,000 of alimony monthly should not be confused with the temporary alimony which may be awarded while a divorce action is pending in district court to provide the *wife* (who is still then a wife) with support money while the litigation process winds its way to a final decree divorcing the parties and terminating the marriage. I know of no statutory provision which entitles an ex-wife to temporary alimony. On the contrary, the prior decisions of this Court in the area of attorney's fees following the entry of a decree make it quite clear that a woman divorced is no longer a wife.

What is for certain, however, is that the status of the monthly alimony payments made pending this appeal is not a matter properly before this Court, and the parties accordingly have not declared it as an issue, nor addressed it. Nor should we, and nor would I now other than that the Court's opinion may on remand be argued as lending itself to the interpretation that this Court has ruled on the status of the 48 monthly $2,000 payments, making such the law of the case and binding on remand. It should not so be. If the plaintiff is to be here held not entitled to *any* permanent alimony, defendant and plaintiff will then have for self-determination, or further litigation in district court, their agreement and the defendant's right, if any, to restitution

for payments which may be found to have not been voluntarily made. Other than that the Court in 1977 prevailed upon the legislature to repeal I.C. § 13–220, that former statute clearly suggested that restitution is in order where money has been paid under the compulsion of a threat of execution to be issued under a judgment—the judgment later having been found erroneous and that the Supreme Court itself, in reversing can direct restitution. Although in the shuffle of going from a long established code pleading to court rules, no rule counterpart to I.C. § 13–220 seems to have belched forth, the language in *Radermacher v. Eckert*, 63 Idaho 531, 123 P.2d 426 (1942) reads rather clearly that a district court can make restitution in the particular action on remand, or even entertain an independent action. *Id.* at 537, 123 P.2d at 428. Equally clear is that the general principles of unjust enrichment as stated in Corpus Juris Secundum and Am.Jur.2d recognize the right to recover payments made under a writ, or under a threat of the writ—the underlying judgment later falling . on appeal. The Court does not seem to have blessed itself with a rule which allows *it* to address the issue. As I say above, it should not do so where the parties obviously did not want the Court to indulge itself.

I agree that the trial court's award of alimony should be set aside; nevertheless, keeping in mind "that the allowance of alimony and the amount thereof, are in the first instance committed to the trial court's discretion," *Nielsen, supra,* 87 Idaho at 585, 394 P.2d at 629, I would on remand direct the district court to now make the re-evaluation as to continuing need and present circumstances and conditions which in my opinion more properly would have occurred two years ago, and at the same time, with the benefit of hindsight into the plaintiff's needs now demonstrated and accountable after four years of experience, reconsider the initial award of any alimony and the amount as well. For certain the trial judge, and other judges, may now have more guidance in this difficult area than was available in 1978 when the decree was entered.

If the alimony awarded by the final decree is to be stricken by a majority vote of this Court, and the trial judge thereby precluded from any further consideration of that issue, it does not follow that the property division should now four years later be laid open for further litigation. The trial court was entrusted by the legislature to make a just division of the property. In the absence of evidence persuading this appellate court that it did not do so, and remembering the attendant presumption of validity, I cannot agree that that issue should be reopened *by this Court*. At best it could authorize the trial court to do so if the trial court will concede that it interwove the issue of property disposition with the issues of alimony entitlement and amount of award. The Court's course of conduct in striking down any alimony, and at the same time allowing Mrs. Ross to retain all sums given her in the four years, and at the same time intimating that a rehash of the property issue may give her a better yield than it did before will seem to some to be nothing short of pure mollification—which may not be good precedent.

Other than that Mrs. Ross was originally awarded alimony, the child support provision was totally inadequate, and should also be reconsidered. Perhaps it would be well to wipe the slate clean—reinstate the Ross marriage, and begin anew.

## II.

### IN RESPONSE TO RULE 54(b) VIEWS OF JUSTICE BAKES

As a practical matter, since the legislature gave birth to irreconcilable differences as grounds for divorce, a divorce is inevitable where sought by either spouse. For instance, observe the philosophy of this Court as expressed in *Ripatti v. Ripatti,* 94 Idaho 581, 583, 494 P.2d 1025, 1027 (1972), where the Court was obliged to reverse a divorce decree awarded a husband who didn't ask for or want such relief, but nevertheless felt free to remand the case with directions practically mandating that the wife-at-fault could obtain a "no-fault

divorce" under I.C. § 32–603(8)—which was not in effect when the divorce was granted.

Here, an entirely different situation from *Ripatti*, it was *both* parties who pleaded and prayed for a dissolution of their marriage. Their prayers were answered, and the marriage dissolved on the defendant's motion, although the wife interposed the objection that she, not the husband, should be awarded the divorce. Hence, there are no reasons, other than spite and tactics, for prolonging the agony where grounds for divorce are pleaded by both parties, or pleaded by one party and admitted by the other. The general experience has been, to the knowledge and observation of practicing attorneys, that a laudable purpose is served by the early termination of a marriage which has deteriorated to bickering, recalcitrances, bitterness and even hatred. The general experience has been that attorneys are best able to counsel and reason with divorced clients in attempting to work out property dispositions and child custody and support agreements.

I do tend to agree that in order to be in technical compliance with the court's rules of procedure, the finality of a decree of divorce entered on motion for partial summary judgment should be cast in stone by the entry of the usual 54(b) certificate. I would surmise that in 90% to 95% of all cases the parties would stipulate to the presentation of the divorce issue on such a motion, and would again stipulate to the entry of the order of certification, and mutually waive any right of appeal. Let me simply say that my concern here is not with those few couples, or one of them, who prefer to hang on to the other spouse either for the infliction of punishment or for other reasons which are not bona fide or legally cognizable. I see no reason for a gratuitous slap at a sound practice simply because of an obsession with rules of the court as applicable to problems which are largely self-manufactured and will only occur in an insignificant number of instances, if ever again.

A decree of divorce, whether it be certified or not, is—unlike partial final judgments in other contexts—not truly subject to revision, as intimated in the dissenting opinion. It is on this basis that I find untenable the view expressed by the dissent that this Court should hold that an uncertified partial decree does not terminate the marriage until all claims in the divorce action have been adjudicated. I am unable to comprehend the manner in which a simple decree which dissolves a marriage would be in need of revision. Parties asking for and receiving a decree of divorce are entitled to believe that the judicial document telling them, and the world, that they are no longer married is for real and may be relied upon. To hold otherwise, as is suggested, would only serve to bring the Court into disfavor with the general public. "Why," it will be asked, "does not this decree of divorce mean what it says, and for what did I pay out my good money"? It is as easy to reach a result today which is both legally sound and in touch with reality.

Just as new attorneys soon learn to tell their clients, "sure, that man can sue you; he may not win, but he can sue," so, too, it is true that a spouse who is awarded a decree of divorce which he or she asked for does have a so-called "right" to appeal. Here again, however, the Court ought not be caught up in the sport of playing with its own rules. In the first place, there will not be many situations where an attorney will allow the client to get involved in such a gambit. But if it does happen, a summary dismissal of the appeal should be the swift and certain disposition. Principles of *judicial estoppel* should suggest to any reasoning mind that a party may not invoke the processes of a court to acquire relief, and then appeal because of an entirely subjective desire that the relief awarded and sought should have been delayed until the exact time suitable to that party—that party desiring to use the withholding of the decree as an instrument of leverage. On that basis the bench, the bar, and especially the public, will be little troubled by our opinion today.

For the reason that such a spurious appeal would be subject to summary dismiss-

al, it is readily seen that there is no substance to an imagined worry of "an interminable delay" in concluding remaining litigation on the ancillary issues of child custody, support, and property disposition. Additionally, I am unable to find anything in I.A.R. 13(b) which divests the district court of jurisdiction to proceed with trial and disposition of the remaining issues. That exact question was posed to extremely able counsel at oral argument in *Joyce Livestock Co. v. Hulet*, 102 Idaho 129, 627 P.2d 308 (1981), and elicited the response that the answer was something he would like to know. No voice from the bench purported to provide any answer. I thought then, and continue to so believe, that appeal of a partial final judgment does not and should not divest the trial court of jurisdiction to hear issues yet untried. At the least that decision should be left to the determination of the trial court. The gratuities in a dissenting opinion infer a belief that, until such an appeal is disposed of and upon remittitur, the case does indeed fall into "limbo." For my part, I fail to understand why this would be required, and especially in this particular situation.

District judges are very close to the people whom they serve, and whose problems they solve—for the most part doing so quietly and efficiently, and without requiring the help of this Court. Recognizing as they do that marriages do come apart and new alliances are made, the only reasonable course of action was that taken here by the district judge, which is that also taken by other district judges throughout the state. I am unable to understand why it is urged that we should be setting up roadblocks to a practice which has been followed for over twenty years, and which has well served the litigants and the practitioners. This Court

has forever indulged in the philosophy that morality should prevail over immorality (hence our common law marriage doctrine has remained inviolate). There is no justifiable reason why the parties to a marriage gone bad must stay married until every last issue of the divorce action has been finally resolved. Carried to the extreme, the contrary view would prohibit remarriages until the divorce action was completely terminated by elapse of appeal time or final determination of any appeal taken. Delaying the legal effect of a decree dissolving a marriage would only be conducive to the establishment of illicit alliances by persons who are actually not so inclined, and serve no proper interest whatever. This would be bad law and a break with Idaho precedent.

As for *Suter v. Suter*,[1] in which case I did not participate, while it has to be conceded that I.C. § 32–909 worked a denial of equal protection,[2] it also should be noted that an alternate route was available in disposing of that problem, and one which finds more favor in the courts than does voiding a legislative statute. The Court could have then, and yet can, save the statute. All that is necessary is a saving judicial interpretation providing that after separation the earnings and accumulations of *both* spouses are the separate property of each.[3] *See Orr v. Orr*, 374 So.2d 895 (Ala.Civ.App. 1979) (construing alimony statutes neutrally to extend benefits to husbands as well as wives); *see also Beal v. Beal*, 388 A.2d 72 (Me.1978). Apparently the opportunity to so rule was not presented to the Court at that time and did not independently surface as a better disposition than the voiding of the statute. For certain, if the *Harrigfeld* and *Orr* solutions were applied to I.C. § 32–909, this would resolve the "problem" seen in the dissenting opinion.

1. *Suter v. Suter*, 97 Idaho 461, 546 P.2d 1169 (1976).

2. Section 32–909 provided that the earnings and accumulations of a wife were to be her separate property when acquired after separation. This exclusion from community property of the post separation earnings of a wife was found to be unconstitutional in *Suter* on equal protection grounds. Thus, the Court eliminat-

ed the statutory exception to the general community property rule and ruled that the post separation earnings of both spouses were to be considered community property subject to assignment. 97 Idaho at 467, 546 P.2d at 1175.

3. This is the exact route taken by the Court in *Harrigfeld v. District Court*, 95 Idaho 540, 511 P.2d 822 (1973).

As a general proposition of jurisprudence, rights and obligations of litigants are set as of the initiation of the complaint. Although trials may sometimes be far down the road, the relief accorded is that to which the prevailing party is found entitled as of the initiation of the action (absent supplemental pleadings introducing issues arising out of events which transpired thereafter). Such being so, there is no sound reason why a spouse, who comes into court and claims his or her right to a dissolution of the marriage, should be entitled to delay and procrastinate and at the same time claim the monetary benefits which may flow from hanging on to the spouse who is, other than financially, persona non gratis. On the contrary, such a spouse should be understood as telling the court that the marriage is over, turn us loose as quickly as you can, and in due time settle our differences regarding property and the children. There is no logical reason why a party should be allowed to insist that the Court confound the situation by a holding that the wife can continue to share in an increase in marital accumulations while in court asking for severance of the marital cord which umbilically provides those very benefits.

With due respect for the sincerity of Justice Bakes' concern for the expected demise of Rule 54(b), which he infers is about to descend upon us per his footnote 7, the trial bench and bar may find that worry somewhat difficult to square with the Court's disposition of a Rule 54(b) certified appeal in *Washington Carriers v. Beckley Trucking*, 102 Idaho 38, 624 P.2d 946 (1981), wherein a dissenting opinion pointed out that the party who *obtained* the certification, then, in a motion to dismiss the ensuing appeal challenged the validity of the certification—the sort of rule gamesmanship which also occurred in *Fuller v. Fuller*, 101 Idaho 40, 607 P.2d 1314 (1980)—both cases perhaps being examples of genuine nullification, which might raise an eyebrow here or there, if not causing an ulcer.

The reader of today's opinions will likely infer that my use of "judicial estoppel" has evoked the manufacture of the phrase, estoppel of "chameleonic guise." My failure to earlier elaborate on judicial estoppel, was occasioned by the belief that it is a well-recognized principle of our jurisprudence. I continue to believe it applicable here, and in addition to referring to 28 Am.Jur.2d, Estoppel and Waiver, §§ 71, 74 (2d ed. 1966). I mention also *Loomis v. Church*, 76 Idaho 87, 93, 94, 277 P.2d 561, 565 (1954), where a unanimous Court said of the doctrine of judicial estoppel:

> "It is quite generally held that where a litigant, by means of such sworn statements, obtains a judgment, advantage or consideration from one party, he will not thereafter, by repudiating such allegations and by means of inconsistent and contrary allegations or testimony, be permitted to obtain a recovery or a right against another party, arising out of the same transaction or subject matter."

Surely it ought to be that a party alleging grounds for a divorce and getting one is hardly in any position to complain of the alacrity with which the Court moved.

BAKES, Chief Justice, dissenting:

My primary concern in writing this dissent is with that portion of the majority opinion which concludes that the plaintiff, Lucy Ross, is estopped from asserting error with regard to the date at which the community terminated for purposes of division of property as a result of the partial summary judgment of divorce. Were it not for the majority's bizarre use of estoppel in this case, as discussed *infra*, I could otherwise concur[1] in the majority opinion.

The concern of the plaintiff on this particular issue is that the trial court refused to take additional evidence on the amount of earnings that the defendant earned, and the amount of any other community proper-

1. It should be noted, however, that the discussion in the majority opinion of both the method of assessing attorney fees under I.C. §§ 32–704 and –708, and the division of property pursuant to I.C. § 32–712, concern the application of those statutes prior to significant amendments made in all of them during the 1980 legislative session.

ty that had accumulated after the partial summary judgment, but before the final judgment, so that those earnings and that property could be included in the property division. As recognized in the majority opinion, Idaho law did not recognize or authorize an interlocutory judgment of divorce prior to the adoption of the Federal Rules of Civil Procedure by Idaho in 1959. *Newell v. Newell*, 77 Idaho 355, 362, 293 P.2d 663, 667 (1956). With the adoption of the federal rules, such judgments have been permissible, but only within the strictures of the Idaho Rules of Civil Procedure, in particular I.R.C.P. 54(b), which governs the "entry of a final judgment upon one or more but less than all of the claims" at issue. In order to make a partial summary judgment a *final* judgment on any issue, including divorce, I.R.C.P. 54(b) specifically requires "an express determination that there is no just reason for delay and . . . an express direction for entry of the judgment." [2] Absent such determination and direction, the partial summary judgment was "subject to revision at any time before the entry of judgment adjudicating *all of the claims* and the rights and liabilities of all the parties," and thus would not have constituted a final judgment of divorce and would not have terminated the marital

community. In the present case, the "order for partial summary judgment and judgment of divorce" contained neither a determination that there was no just reason for delay, nor a direction for entry of the judgment. Thus, I.R.C.P. 54(b) clearly indicates that the uncertified partial summary judgment was not final, and therefore did not have the force of law. *Joyce Livestock Co. v. Hulet*, 102 Idaho 129, 627 P.2d 308 (1981); *Dawson v. Mead*, 98 Idaho 1, 557 P.2d 595 (1976). While an uncertified partial summary judgment on the issue of divorce removes that issue from trial, it does not terminate the marriage until the date of the final judgment adjudicating *all* of the claims between the parties. Since the partial summary judgment in the case at bar did not meet the requirements of I.R.C.P. 54(b), the accumulation of community property continued until the date of the final judgment.[3]

The continuing nature of the marriage following the partial summary judgment of divorce in this case is of particular significance in light of the trial court's order that the final judgment be entered *nunc pro tunc* to the date of the partial summary judgment. The purported effect of that order was to relate the property division

**2.** I.R.C.P. 54(b) still contains the same requirement, but has since been amended to require a formal 54(b) certificate setting forth such determination and direction. The use of the word "certification" in the present opinion refers to meeting the requirements of I.R.C.P. 54(b) as they existed at the time of the proceedings below.

**3.** By granting such uncertified partial summary judgments of divorce, courts may be fostering in the parties a false sense of "freedom." Parties believing they are divorced may enter into new relationships or marriages when in fact the prior marriage has not been terminated. Property division and maintenance obligations are also subject to confusion when a partial summary judgment of divorce is entered. Community property is created by the efforts of the parties, and marital financial obligations continue until the divorce is final. *See Suter v. Suter*, 97 Idaho 461, 546 P.2d 1169 (1976). Thus, despite a partial summary judgment of divorce, marital obligations and the accumulation of community property continue absent a Rule 54(b) certificate.

Problems, however, are not avoided by merely adding a Rule 54(b) certificate of finality to such a partial summary judgment granting a divorce. Assuming that such a Rule 54(b) certificate would be upheld, *see Joyce Livestock Co. v. Hulet*, 102 Idaho 129, 627 P.2d 308 (1981), *Pichon v. L. J. Broekemeier, Inc.*, 99 Idaho 598, 586 P.2d 1042 (1978), it might well result in an interminable delay in the litigation. If a notice of appeal were filed by either party as a result of the entering of such a certified partial summary judgment, the trial court would then be ousted from any further jurisdiction to proceed to determine the property and support rights of the various parties, I.A.R. 13(b) *First Security Bank v. Neibaur*, 98 Idaho 598, 570 P.2d 276, 282 (1977), and the parties' property rights would be in limbo for as long as it would take this Court to ultimately decide the appeal, at present nearly three years. Consequently, regardless of whether certified under Rule 54(b) or not, partial summary judgments granting only divorce, leaving the difficult property, support and custody questions for later, may accomplish little and are apt to cause severe dislocations, as this case is a good example.

and all other aspects of the final judgment back to September 20, 1976, the date of the partial summary judgment.[4] In the absence of a Rule 54(b) certification finally terminating the marriage as of that time, however, such action was improper.

An entry of judgment *nunc pro tunc* represents "the power of the court to amend *records* of its judgments by correcting mistakes or supplying omissions therein, and to apply such amendments retroactively . . . ." 46 Am.Jur.2d, Judgments § 186 (1969) (emphasis added). However, "[t]he failure of a court to act, or its incorrect action, can never authorize a *nunc pro tunc* entry. If a court does not render judgment, or renders one which is imperfect or improper, it has no power to remedy any of these errors or omissions by treating them as clerical misprisions. Omitted judicial actions cannot be supplied, even though it would have been proper in the first instance, . . . ." 1 Freeman on Judgments, § 131 (5th ed. 1925); *see* Annot. 19 A.L.R.3d 648 (1968). Consequently, since the partial summary judgment was lacking Rule 54(b) certification, that omission cannot later be supplied by an order *nunc pro tunc* changing the nature of the partial summary judgment. As was stated in *Black v. Industrial Comm'n of Arizona,* 83 Ariz. 121, 317 P.2d 553, 555 (1957), "[T]he court cannot do more than to make the record correspond with the actual facts."

We have recently affirmed the power of our courts to enter an order *nunc pro tunc* within the context of a motion made pursuant to I.R.C.P. 60(a), which outlines the procedure for correcting "clerical mistakes" in the record. *Merrick v. Pearce,* 97 Idaho 250, 542 P.2d 1169 (1975). In *Merrick,* the court entered an amended judgment *nunc pro tunc* to correct a clerical mistake in the amount of the original judgment.

"The case was tried before a jury which returned special verdicts of $5,422.99 for the plaintiff in his claim against the defendants and for $7,994.67 for the defendants upon their counterclaim against the plaintiff. The trial judge, however, entered judgment for the defendants against the plaintiff in the amount of $8,441.35 rather than in the amount of $2,571.68, the difference between the special verdicts." *Id.* at 251, 542 P.2d at 1170.

In that case we permitted the amendment *nunc pro tunc* because it was clear that the actual net judgment was for $2,571.68.[5] The amendment *nunc pro tunc* was merely to make the written record conform with the true actions of the court. However, the order *nunc pro tunc* in the present case is quite different from that permitted under I.R.C.P. 60(a) and *Merrick v. Pearce, supra.* Rather than merely correcting the record to accurately reflect the actual facts of the court's prior actions, the order *nunc pro tunc* in this case purported to create a new condition, *i.e.,* finality of the partial summary judgment of divorce, which changed both the property rights and status of the parties, but which had not previously been certified as final by the court. Such action constitutes reversible error. The effect of the order *nunc pro tunc* was to arbitrarily deprive the plaintiff of an accounting of a portion of the community property.

The majority has employed the ubiquitous last resort theory of estoppel[6] to de-

---

**4.** Although the district court did set out in its order that "the community property should be valued as close in time to the March 14, 1977, trial date, as possible," the order is ambiguous. It is not clear whether "valued" means merely that community property accumulated as of September 21, 1976, shall be valued as of March 14, 1977, or whether "valued" also means the inclusion of community property accumulated through March 14, 1977. However, the order clearly excludes additional community property acquired during the eight

months between trial and the entry of final judgment.

**5.** I.R.C.P. 54(b) provides in part: "If any parties to an action are entitled to judgments against each other such as on a claim and counterclaim, or upon cross-claims, such judgments shall be offset against each other and a single judgment for the difference shall be entered in favor of the party entitled to the larger judgment."

**6.** The trial court made no factual finding of estoppel. It was not raised by the defendant

feat the plaintiff's obviously correct reading of Rule 54(b) by stating that "the plaintiff has taken advantage of the favorable provisions of the judgment" and thus cannot assert the clear provisions of Rule 54(b).[7] The majority cites *Culbertson v. Culbertson,* 91 Nev. 230, 533 P.2d 768 (1979), and *Willis v. Willis,* 93 Idaho 260, 460 P.2d 396 (1969) to support its estoppel finding. Both of those cases, however, involved attacks upon *final* judgments. Estoppel was not employed in those cases to establish the finality of an otherwise interlocutory judgment.

The existence of estoppel, be it quasi, equitable, promissory, or of some other chameleonic guise, requires some act by the person being estopped which yields benefit to himself and, conversely, induces some detrimental act on the part of the estoppor. Such is recognized by the majority in its citation to *Tommerup v. Albertson's, Inc.,* 101 Idaho 1, 6, 606 P.2d 1055, 1060 (1980).

However, there is *nothing* in the record to support the majority's bald conclusion that the plaintiff has received any "advantage" from the partial summary judgment. The majority asserts that "[s]he has received large amounts of property," but fails to point out that it was her own property wrongfully withheld from her by her husband. She did *not* receive that from the partial summary judgment in any event, as the majority infers, but only after entry of the final judgment, and then only after having to resort to a writ of execution in order to obtain from her husband that which was already hers. Another "advantage" of the partial summary judgment which the majority finds was the removal of the divorce issue from trial, something which the plaintiff did not want and which she opposed—which is hardly an "advantage."[8] Finally, the majority states that plaintiff "has received $2,000.00 per month alimony during the pendency of this appeal" and therefore should be estopped. However, that benefit was not derived from the partial summary judgment, or even the final judgment which awarded $2,500 a month, but has its source in an *agreement* by *both* parties.

It is obvious that the majority, in applying its "quasi estoppel" doctrine, fails to distinguish between the partial summary judgment to which it is applying the so-called "quasi estoppel," and the final judgment, from which the so-called "advan-

---

John Ross on appeal. The majority has made that factual determination for the first time on appeal.

7. The estoppel action taken by the majority has not only rendered the certification requirements of Rule 54(b) utterly meaningless, but has arbitrarily deprived the plaintiff of her share of the community property accumulated during the fourteen month period between the interlocutory uncertified partial summary judgment and the final judgment which was rendered in this action. With the Court's decision today, the certification provision of I.R.C.P. 54(b) has been effectively eliminated. First this Court held, in *Pichon v. L. J. Broekemeier, Inc.,* 99 Idaho 598, 586 P.2d 1042 (1978), that even though a partial summary judgment was certified to be final pursuant to I.R.C.P. 54(b), it nevertheless was held not to be. In this case, the Court now holds that a partial summary judgment which is *not* certified as final pursuant to I.R.C.P. 54(b) is, nevertheless, final. The certainty which the I.R.C.P. 54(b) certificate was intended to provide has been nullified. That rule, by the majority's action, has been abandoned to an unfortunate union with a multitude of other sound legal doctrines that have

fallen victim to the voracious appetite of estoppel.

8. While it is true that the plaintiff initially filed the divorce action, the record clearly indicates that the motion for partial summary judgment for an interlocutory order of divorce was made by the defendant, John Ross, and was opposed by the plaintiff. Furthermore, neither party requested that the partial summary judgment, after it was entered, be certified as final. The unfortunate action of the defendant in attempting another marriage following the uncertified partial summary judgment was not the result of any inducements by the plaintiff, but was caused by the defendant's own failure to respect the interlocutory nature of the uncertified partial summary judgment which he himself requested. Following the logic of the majority, any party who successfully moves for a partial summary judgment may treat that judgment as final, even though uncertified, if he should happen to get himself into a bad enough fix. Such a result clearly exceeds even the amorphous bounds of estoppel, which the majority claims to be employing.

tages" flow. If the majority is really serious about applying the doctrine of "quasi estoppel" to situations where a party receives some but not all of the relief to which he is entitled in a final judgment, and then appealing from that judgment is "quasi estopped" to assert error on appeal as to that judgment unless he disavows those portions of the judgment which were to his advantage, it has unwittingly made a radical change in appellate practice.

Additionally, if Lucy Ross is estopped under these facts from arguing error in the court's disposition of property, then applying the same rule of "quasi estoppel" the defendant John Ross should also be estopped from appealing the award of alimony to Lucy Ross. It was John Ross who actively sought the divorce by moving for partial summary judgment of divorce. John Ross has benefited from the decree of divorce in no lesser degree than did the plaintiff. John Ross obtained the benefit of being free from his wife so that he could immediately marry his office assistant. Lucy Ross was disadvantaged in that she was left in middle age after serving as homemaker for almost twenty-five years to start from scratch in qualifying herself for outside employment. She was disadvantaged in that she felt compelled by the tragic events surrounding the divorce to travel thousands of miles across the country in an attempt to pick up the pieces and establish a new life. As to the property which the majority found that Lucy Ross received and which she has taken "advantage" of, the defendant John Ross received an equal amount and has taken "advantage" of it. Now, John Ross attempts in this appeal to both take advantage of the "favorable provisions of the judgment" and "maintain a position which is inconsistent" with his acceptance of those benefits under the judgment, by seeking to eliminate the plaintiff's alimony lifeline. If Lucy Ross is estopped from attacking the judgment in order to seek her full share of the community property, then applying the majority's own rationale, why isn't John Ross also estopped from attacking the alimony provision of the judgment? If the Court's new rule of "quasi estoppel" is anything akin to the recognized rules of equitable estoppel which have previously existed in Anglo-American jurisprudence, then it has its genesis in the determination that one party is at fault, or has come into court with "unclean hands." On the record in this case it is absolutely clear that in an "unclean hands" contest the defendant John Ross would lose hands down. Why then is the wife being penalized? The only other explanation for the unequal application of the Court's "quasi estoppel" rule in this case suggests a veiled attempt to circumvent the constitutional prohibitions imposed by the United States Supreme Court in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979).

If the majority's "quasi estoppel" holding is going to be the law in this state, then it should also be applied against the husband John Ross, and the trial court's judgment should be affirmed *in toto*.