739 P.2d 273

**Charles H. SWOPE, Plaintiff, Counterdefendant, Respondent,**

v.

**Isabel SWOPE, Defendant, Counterclaimant, Appellant.**

**No. 16337.**

Supreme Court of Idaho.

March 31, 1987.

Rehearing Denied June 18, 1987.

Jeffrey E. Rolig, of Hepworth, Nungester & Felton, Twin Falls, for defendant, counterclaimant, appellant.

Lloyd J. Webb, of Webb, Burton, Carlson & Pedersen, Twin Falls, for plaintiff, counterdefendant, respondent.

BAKES, Justice.

This is an appeal from a property distribution in a divorce action. Isabel Swope (Isabel) appeals from a district court decision which affirmed in part, reversed in part and remanded a magistrate's order which had divided the property of Isabel and her former husband Charles Swope (Charles), respondent.

Isabel and Charles were married on July 31, 1976, and separated during the fall of 1980. The divorce was initiated by Charles on November 17, 1980. On December 12, 1980, Charles moved for partial summary judgment on the divorce issue which was granted on January 21, 1981. Neither party moved to have the magistrate certify the partial summary judgment as final under I.R.C.P. 54(b), and the action continued concerning the characterization, valuation and division of the property. During the pendency of the remainder of the action, a reunion of the parties (including cohabitation) took place, beginning in August of 1981, which lasted for approximately twelve months. However, there was no ceremonial remarriage of the parties.

When the reconciliation failed, and the parties separated again, the magistrate entered an order requiring Charles to pay to Isabel from the community property, most of which had remained in Charles' possession, the sum of $1,000 per month. This payment was to be offset against the amount of community property that Isabel would ultimately be entitled to.

Following trial, the magistrate entered his findings of fact and memorandum decision on February 6, 1984, in which he divided the property of the parties. On the issues which are raised on this appeal, the magistrate ruled that (1) the partial summary judgment entered January 21, 1981, did not terminate the marriage or the community, which continued until the magistrate entered his final judgment in February of 1984; (2) that no decision was necessary on the issue of whether or not the reconciliation constituted a common law remarriage, since the magistrate had ruled that the marriage was not terminated until February of 1984; (3) that Charles' undistributed earnings from a one-fourth interest in a separate property partnership, and the retained earnings attributable to his separate property stock in a Subchapter "S" corporation were not community property; (4) that money in a bank account which originally had been Charles' separate property was so comingled as to make the entire account community property.

Charles filed an appeal from this decision with the district court, and Isabel cross appealed. The district court reversed the magistrate on issues (1) and (2), ruling that the divorce was final on the date of the partial summary judgment and remanded the case to the magistrate to characterize and value all property in the dispute as of the date of the partial summary judgment and, further, to determine whether Charles and Isabel were involved in a common law marriage *during their reconciliation during* 1981 and 1982.

On appeal to this Court Isabel raises five issues regarding the effective date of the divorce and the distribution of property.

I

The first issue we must address is whether the district court erred in reversing the magistrate's conclusion that the marriage of Isabel and Charles was not terminated by the partial summary judgment on January 21, 1981. The magistrate ruled that the partial summary judgment granting the divorce was not final, there being no I.R.C.P. 54(b) certificate attached, and that

the parties were still married until the date of the trial on the property issues. He characterized and valued the property as of that date. Accordingly, the magistrate found it unnecessary to rule on the question of whether the reconciliation resulted in a common law marriage.

The district court reversed the magistrate and held that the divorce was effective on the date partial summary judgment was granted, even though there was no I.R.C.P. 54(b) certificate attached by the trial court. The district court then remanded the case for valuation of the assets existing at the time of the granting of the partial summary judgment. The district court also directed that the magistrate make findings on whether there had been a common law marriage as a result of the reconciliation. We agree with the magistrate's ruling and reverse the district court.

I.C. § 32–601 sets out the only manner in which marriages may be dissolved. *Newell v. Newell,* 77 Idaho 355, 293 P.2d 663 (1956).

"**32–601. Dissolution of marriage.** —Marriage is dissolved only:

"1. By the death of one of the parties; or

"2. By the judgment of a court of competent jurisdiction decreeing a divorce of the parties."

Prior to the adoption of the Federal Rules of Civil Procedure in 1959, it was the longstanding interpretation of I.C. § 32–601 that the courts could not recognize or authorize an interlocutory judgment of divorce. *Newell v. Newell,* 77 Idaho 355, 362, 293 P.2d 663, 667 (1956); *Radermacher v. Radermacher,* 61 Idaho 261, 100 P.2d 955 (1940). In *Newell v. Newell, supra,* the Court stated:

"The divorce laws of Idaho make no provision for an interlocutory judgment of divorce, I.C. Title 32, chapters 6, 7 and 8; nor recognize the right to a divorce from bed and board. *Radermacher v. Radermacher,* 61 Idaho 261, at 269, 100 P.2d 955." 77 Idaho at 362, 293 P.2d at 667.

Even after Idaho adopted the Federal Rules of Civil Procedure in 1959, the rule

expressed in *Newell v. Newell, supra,* requiring a final decree before divorce is legally final, was applied in our cases. *See Suter v. Suter,* 97 Idaho 461, 546 P.2d 1169 (1976); *In re Duncan,* 83 Idaho 254, 360 P.2d 987 (1961). However, the adoption of the federal rules, and more specifically 54(b),[1] and the adoption of the Idaho Appellate Rules, more specifically I.A.R. 11,[2] has modified to some extent the *Newell* rule. I.A.R. 11 and Idaho Rule of Civil Procedure 54(b) provide a way for litigating parties to seek appellate review of interlocutory issues resolved at the trial court level, when the entire case has not been totally resolved. However, to have such a partial summary judgment considered as a final judgment it must be shown that "there is no just reason for delay," and "[i]n the event that the trial court determines that a judgment should be certified as final ... the court *shall execute a certificate....*" I.R.C.P. 54(b) (emphasis added). It is the I.R.C.P. 54(b) certificate which determines that the judgment is a final judgment upon which execution may issue and which may be appealed.

How and when marriages can be consummated or terminated is a matter for the legislature.

"The legislature of each state has the power to control and to regulate marriages within its jurisdiction. This includes the power to regulate the qualifications of the contracting parties and the proceedings essential to constitute a marriage.... [Citing cases.]

"A state may declare what marriages it will recognize as valid no matter where performed and a claimed or purported marriage may be declared void when it is contrary to the positive law of the state of the domicile of the parties." *In re Duncan,* 83 Idaho at 259–260, 360 P.2d at 990.

Many states not only do not recognize interlocutory divorce decrees, but have statutes imposing a "cooling off" period, requiring either a period of time delaying the time of filing a complaint or the entry of a final divorce decree, or a provision that a final divorce decree will, nevertheless, remain interlocutory for a stated statutory period, usually three to six months. An-

1. **Rule 54(b). Judgment upon multiple claims or involving multiple parties.**—*When more than one claim for relief is presented* in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment upon one or more but less than all of the claims or parties only upon an express determination that *there is no just reason for delay* and upon an express direction for the entry of the judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates less than all the claims or the rights and liabilities of less than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties. If any parties to an action are entitled to judgments against each other such as on a claim and counterclaim, or upon cross-claims, such judgments shall be offset against each other and a single judgment for the difference between the entitlements shall be entered in favor of the party entitled to the larger judgment. *In the event the trial court determines that a judgment should be certified as final under this Rule 54(b), the court shall execute a certificate which shall immediately follow the*

court's signature on the judgment and be in substantially the following form:

RULE 54(b) CERTIFICATE
"With respect to the issues determined by the above judgment or order it is hereby CERTIFIED, in accordance with Rule 54(b), I.R.C.P., that the court has determined that there is no just reason for delay of the entry of a final judgment and that the court has and does hereby direct that the above judgment or order shall be a final judgment upon which execution may issue and an appeal may be taken as provided by the Idaho Appellate Rules. ...." I.R.C.P. 54(b) (emphasis added).

2. **"Rule 11. Appealable judgments and orders.** —An appeal as a matter of right may be taken to the Supreme Court from the following judgments and orders:

"(a) Civil Actions. From the following judgments and orders of a district court in a civil action:

  (1) Final judgments and decrees including orders of the district court granting or denying peremptory writs of mandate and prohibition.
  ....
  (3) Judgments made pursuant to a partial judgment certified by the trial court to be final as provided by Rule 54(b), I.R.C.P.
  ...."

not., *Divorce—Cooling Off Period*, 62 A.L.R.2d 1262, 1266 (1958).

"These statutes have been of two principal types: (1) those which require delay, such as six months, between the commission of the offense and the filing of the petition which complains of it; and (2) those which require delay between the filing of the petition (or service of the process) and the date of the trial. The most obvious purpose of such a statute is to give the parties time to 'cool off,' or the time for reflection, so that they may effect a reconciliation." 24 Am.Jur.2d, *Divorce and Separation*, § 337 (1983). The purpose behind such statutes is to encourage reconciliations and thereby preserve the institution of marriage in our society.

In our view, in divorce actions I.R.C.P. 54(b) serves such a function. It gives the discretion to the trial court to evaluate the parties to determine whether or not, in his opinion, a reconciliation is possible or desirable. If the trial court determines that, in his best judgment, a reconciliation is neither possible nor desirable, he may immediately certify a partial summary judgment of divorce as final under I.R.C.P. 54(b) prior to the time that the balance of the property issues are decided. However, if in the opinion of the trial court there is a possibility that the parties might reconcile, and that a "cooling off" period is desirable, he may grant a partial summary judgment of divorce, thereby removing that issue from further litigation, but refuse to certify it as final, thereby encouraging reconciliations. The decision to grant or deny a 54(b) certificate is, by the rules of civil procedure, vested in the sound discretion of the trial judge who is best able to evaluate the situation before him. Such a discretion vested in the trial court advances both the interests of the parties and of society. Where speed and finality best suit the needs of the parties, the trial court can

move with dispatch in rendering a partial judgment of divorce and certify it as being final, even though other important issues remain unresolved. If it is in the best interests of the parties and society that a "cooling off" period occur, the trial judge can grant the partial summary judgment removing the divorce issue from litigation, but nevertheless not certify it as final at that time.

The magistrate specifically stated in his memorandum opinion that, "The partial summary judgment granted in this case will not become a final judgment as contemplated by I.C. § 32–601 until such time as either this court resolves the issues in this case including but not limited to the division of property or makes a determination that a Rule 54(b) certificate should issue, I.R.C.P. 54(b), *Viani v. Aetna Insurance Co.*, 95 Idaho 22, 501 P.2d 706 (1972)." In finding of fact 14, the magistrate specifically stated that "the summary judgment was not certified as a final judgment." Therefore, it is clear that the trial magistrate, after evaluating the parties and their needs, determined, in his discretion, that the partial summary judgment should not be final at that time. Subsequent events proved that the magistrate's judgment was sound because the parties shortly thereafter reconciled.[3]

To accept Charles' position, that an uncertified partial summary judgment is final in a divorce action, is not only contrary to the express provisions of I.R.C.P. 54(b), but could lead to difficult accounting and management problems both for the court and the parties. First, in this case there would be a community property regime from July, 1976, through January, 1981; a separate property regime for each of the parties from January, 1981, through August, 1981; and then, if the reconciliation resulted in a common law marriage, another community property regime from August, 1981, through the fall of 1982; and

---

**3.** While the district court reversed the magistrate and remanded to determine whether or not this reconciliation resulted in a common law marriage, that issue seems to have been resolved by the magistrate's findings of fact 15 and 16, which stated in part, "The parties at this time [August of 1981 when they reconciled] intended to resume a normal marital relationship. The parties continued to live together as husband and wife until July, 1982, at which time defendant moved from the house of the plaintiff on San Larue."

then, after the final separation in the fall of 1982, another property regime in which the community property is mostly in the hands of one of the parties. The accounting problems posed by such a staggered marital regime would be substantial.

Secondly, even if there was no reconciliation-remarriage, as there appears to have been in this case, difficult accounting problems can nevertheless occur when such a partial summary judgment is certified as final. During the pendency of the balance of the litigation regarding the valuation and distribution of the community property, one of the spouses may be in control of a substantial portion of that community property (which is often the case when business property is involved). In such situations, although one spouse might control the property, the income from or any enhancement of value of that community property during the balance of the litigation would be owned jointly by both parties, and this would again create additional accounting problems and financial pitfalls for the spouse who is not in control of the property.

All of these factors, including the personal needs of the parties and the interests of society, especially where minor children are involved, are factors to be weighed and considered by a trial judge in determining whether or not to certify a partial summary judgment granting divorce as final under I.R.C.P. 54(b). The final decision is left to the sound discretion of the trial judge.

Considering all of the factors involved in the present case, we conclude that the magistrate did not err in refusing to certify the partial summary judgment as final. Accordingly, the district court was in error when it reversed that portion of the trial court's decision. We do not view our decision today as inconsistent with our earlier case of *Ross v. Ross,* 103 Idaho 406, 648 P.2d 1119 (1982). In *Ross* we held that the wife was estopped by her conduct from denying the finality of an uncertified partial summary judgment granting a divorce. In *Ross,* the husband, relying upon the conduct of the wife, had made certain payments and had remarried a third person.

In this case, no such circumstances exist; the parties instead reconciled, an obviously different situation.

Accordingly, the district court's judgment reversing the magistrate court's determination that the partial summary judgment did not terminate the marriage and that the community continued until the final decree in February of 1984, is reversed, and the magistrate's decision on this issue is reinstated.

II

The second issue deals with the district court's characterization of the Pepsi Cola Bottling Company property (Pepsi) owned by Charles prior to marriage. At the time of marriage, Charles owned an undivided ¼ interest in a partnership which owned both the real and personal property associated with the operation of the Pepsi Cola Bottling Company of Twin Falls. The business was incorporated on March 1, 1979, but the real property remained in the partnership and was leased to the corporation. Charles received stock in the corporation and retained his same percentage ownership in the partnership. The corporation made a Subchapter "S" election to be taxed as a partnership pursuant to the Internal Revenue Code and the Idaho Income Tax Act.

During the years that the parties were married, income taxes on the undistributed earnings from both his separate property interest in the partnership and from the retained earnings of the Subchapter "S" corporation were paid with community funds by Charles.

Charles's interest in the bottling company was sold on June 6, 1980, for $840,000, with $125,000 paid down and monthly payments of $10,007.06 at 15% per annum on the unpaid principal balance. This sale included all of Charles' corporate stock and debentures in the corporation as well as his partnership interest in the real property. The magistrate found that the property involved in the sale was in all respects the separate property of Charles, and the district court affirmed the finding. On appeal

to this Court, Isabel alleges that the ruling was error. We agree, in part.

### (a) *Retained earnings in the partnership*

■ Regarding the characterization of the retained earnings of the partnership property, Isabel contends that the magistrate and the district court erred in determining that the Pepsi Cola Bottling partnership retained earnings were the separate property of Charles. The record reflects, and the magistrate found, that while a substantial amount of the earnings of the partnership were distributed to Charles and deposited into the parties' joint bank account which was initially his separate account, some $75,765.00 of the earnings of the partnership were retained and not distributed.[4] Isabel argues that these partnership retained earnings, being income of separate property, were by statute community property, and that, being retained and comingled in the partnership business, Charles' interest in the business was also converted into community property. We agree with Isabel's position that the retained earnings of the separate property partnership interest were community property and that the lower courts erred in failing to so recognize.

The starting point in this analysis is the relevant statutes.[5] While I.C. § 32–903 states that "[a]ll property of either the husband or the wife owned by him or her

before marriage ... shall remain his or her sole and separate property," I.C. § 32–906 provides that "[t]he income of all property, separate or community, is community property...." Thus, even though Charles' interest in the Pepsi partnership was owned by him before marriage and thus was initially separate property, all income distributed from the Pepsi partnership was community property. I.C. § 32–906. The issue which we must decide is whether the retained earnings [6] of a partnership constitute income within the scope of I.C. § 32–906.

Such earnings can be analogized to the accrued income of a separate property Certificate of Deposit owned by a spouse before marriage, but not redeemable until after marriage. The interest income on such a certificate would clearly constitute community property under I.C. § 32–906, even though it accumulates and is not distributed to the owner/spouse. Earnings from a separate property partnership are essentially no different. To hold otherwise would allow a spouse to place separate income-producing property in a partnership and shelter the income from the community by retaining the income in the partnership, contrary to the legislative policy set out in I.C. § 32–906.

Charles nevertheless argues that his retained earnings in the Pepsi partnership should be given the same treatment as corporate retained earnings receive in Ida-

---

**4.** The magistrate did find that during the marriage the partnership did earn the following profits which were partially distributed on four different occasions. The chart below summarizes those findings:

Partnership profit distribution

| Date | Charles' Share of Partership Profits | Charles' Withdrawals | Charles' Accumulated Profits |
|---|---|---|---|
| 8/1/76 | $ 24,197 | $10,000 | $14,197 |
| 12/1/76 | 93,732 | 77,272 | 26,460 |
| 12/1/77 | 108,025 | 89,893 | 18,132 |
| 12/1/78 | 16,976 | —0— | 16,976 |
| Total Accumulated Profits | | | $75,765 |

The magistrate failed to make findings as to any partnership profits earned between December 1, 1978, and March 1, 1979, when all the partnership's assets, except the real property, were transferred to the corporation.

**5.** "**32–903. Separate property of husband and wife.**—All property of either the husband or the wife *owned* by him or her *before marriage,* and that acquired afterward either by gift, bequest, devise or descent, or that which either he or she shall acquire with the proceeds of his or her separate property, byway of moneys or other property, shall remain his or her sole and separate property." (Emphasis added.)

"**32–906. Community property—Income from separate and community property—Conveyance between spouses.**—(1) All other property acquired after marriage by either husband or wife is community property. *The income of all property, separate or community, is community property....*" (Emphasis added.)

**6.** Retained earnings are the "portion of profits which has not been paid out...." Black's Law Dictionary (1979).

ho under our decisions in *Simplot v. Simplot*, 96 Idaho 239, 526 P.2d 844 (1974), and *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974). Both cases held that the retained earnings of a corporation were neither income nor rents and profits of the separate property stock owned by the spouse, within the meaning of I.C. §§ 32–903 and 32–906 and, therefore, the separate property stock remained the husband's separate property upon divorce. However, the fundamental differences between corporations and partnership undercut Charles' arguments. While both are designed to carry out business for profit, a corporation is a separate legal entity distinct from its shareholders; a partnership is not a separate entity, but instead is the sum of the owners' interests.

The fundamental ownership and control differences between partnerships and corporations were highlighted by the rationale behind the *Simplot* decision that:

> "Corporate earnings and profits remain the property of the company, until severed from the assets and distributed as dividends among the stockholders entitled thereto. A stockholder has no property rights in the accumulated earnings and surplus of the corporation, and any right that he may have to cumulated undeclared dividends is not a vested property or constitutional right but is subject to change or cancellation by proper corporate law. It is the declaration of the dividend which creates both the dividend itself and the right of the stockholder to demand and receive it." 96 Idaho at 242, 526 P.2d at 847, *citing* 11 W.Fletcher, Encyclopedia of the Law of Private Corporations, § 5321 at 613 (1971).[7]

A partner, on the other hand, has a right to direct the payment of earnings or, if the other partners disagree, to dissolve the partnership and thereby obtain any retained earnings. I.C. § 53–331(1)(b). A stockholder has no equivalent right since all corporate powers are exercised by the board of directors. I.C. § 30–1–35. A partnership interest "is his share of the profits and surplus, *and the same is personal property*." I.C. § 53–326 (emphasis added). A shareholder in a corporation owns stock that only represents his voting and monetary interest. Stockholders are not agents of the corporation and do not make business decisions, but partners are

> "agent[s] of the partnership for the purpose of its business, and the act of every partner, including the execution and partnership name of any instrument, *for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership*, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." I.C. § 53–309 (emphasis added).

A partnership, then, is a contract of mutual agency, where each partner acts as a principal in his own behalf and as an agent for his co-partners, *State v. Cosgrove*, 36 Idaho 278, 285, 210 P. 393 (1922), while the corporation is a separate and distinct entity, apart from the owners. The partner can exercise direct control over the business, while the stockholder exercises only limited and indirect control over the corporation.

It is clear that unlike *Simplot*, where the husband was a stockholder and "the decision of the directors to reinvest the earnings [was] a matter of business judgment," outside of the husband's control, 96 Idaho at 242, 526 P.2d at 847, a partner is an integral part of a business with the ability to affect the flow of profits and distributions or to retain them within the business. Based on these fundamental differences between corporations and partnerships regarding control and management of the business, we hold that the earnings of a separate property partnership, whether re-

---

7. In fact, minority stockholders in closely held corporations have little or no right to influence the management of the corporation. I.C. § 30–1–80 does give a shareholder of a corporation the right to obtain payment for his shares in a corporation when certain events enumerated in the statute take place. This section does not impact a shareholder's inability to control distributions from earned surplus.

tained or distributed, are community property within the scope of I.C. § 32–906.

Our decision today is in conflict with the Idaho Court of Appeals decision in *Brazier v. Brazier*, 111 Idaho 692, 726 P.2d 1143 (1986). *Brazier* addressed the same partnership retained earnings issue raised in this case, but came to an opposite conclusion based on a belief that, because the facts in that case showed that the wife's separate property partnership interest was managed by a "manager (the wife's father) exercising a power conferred by the partnership agreement," *Brazier v. Brazier*, *supra* at 695, 726 P.2d at 1146, that the retained earnings could be analogized to the corporate setting. However, based on the foregoing discussion it is clear that most of the considerations underlying *Simplot v. Simplot, supra*, do not carry over to the partnership setting. The underlying tenets of partnership law allow a partner direct and immediate control over the partnership assets and income. To the extent that *Brazier* is inconsistent with our decision in this case, it is overruled.

(b) *Charles' stock interest in the Pepsi Cola Bottling Corporation.*

From the date of the marriage until February 28, 1979, Charles owned a one-fourth partnership interest in the Pepsi Cola Bottling Company of Twin Falls. However, on March 1, 1979, the assets in the partnership, except the real property, were transferred to a corporation known as the Pepsi Cola Bottling Company of Twin Falls, a corporation. For his one-fourth share of the partnership assets transferred to the corporation, Charles received 4000 shares of stock and $100,000 in 12% debenture notes. The trial court found that following this transfer Charles performed no services for the corporation, but nevertheless received a salary from the corporation, together with dividend payments on his stock interest. The trial court made no finding of the market value of the assets transferred in exchange for the 4000 shares of stock and the $100,000 in debenture notes.

On June 6, 1980, approximately fifteen months later, Charles sold all of his stock and the debenture notes of the Pepsi Cola bottling corporation, and his 25% interest in the partnership for the sum of $840,000, payable $125,000 down and the balance in installments.[8]

At the time that Charles sold his 4000 shares of corporate stock on June 6, 1980, Charles' share of the undistributed taxable income as defined by 26 U.S.C. § 1373, which had been retained by the corporation, was the sum of $39,171. That income was reported on Charles' joint income tax return and he paid income tax on that undistributed taxable income, apparently with community funds.[9] Isabel contends that the magistrate erred in not finding that Charles' share of the undistributed profits of the corporation in the sum of $39,171, which the corporation had accumulated and retained between March 1, 1979, and June 6, 1980, was community income. Isabel argues that when the stock was sold on June 6, 1980, increased value of the stock reflected this "investment" of retained earnings, and therefore the commu-

---

**8.** There is an apparent typographical error in the trial court's findings regarding the sale. The findings listed the sale price as $840,000.00, with $125,000 down payment and a deferred balance of $750,000.00. This latter figure should have been listed as $715,000.

**9.** The Pepsi Cola bottling corporation had made a Subchapter "S" election under Sec. 1372 of the Internal Revenue Code (26 U.S.C. § 1372). Subchapter "S" is an alternative accounting practice authorized by the Internal Revenue Code which permits a qualifying corporation to avoid double taxation of profits by electing to have the corporate income taxed solely to the stockholders rather than first at the corporate level, and then subsequently to the stockholders if and

when any profit is actually distributed as dividends. Income of corporations which make the election is taxed to the stockholders in the year earned whether or not the income is distributed to the stockholders or retained by the corporation. The "Idaho Business Corporation Act," I.C. §§ 30–1–1 *et seq.,* is not affected or preempted by a federal Subchapter "S" election. Shareholders gain no new control over the management of a corporation which has made a Subchapter "S" election. Requirements for the distribution of dividends are still left in the control of the Board of Directors under I.C. § 30–1–45. *See Simplot v. Simplot,* 96 Idaho 239, 526 P.2d 844 (1974).

nity should be reimbursed for those retained earnings. Charles argues, on the other hand, that under our prior cases of *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974), and *Simplot v. Simplot*, 96 Idaho 239, 526 P.2d 844 (1974), retained earnings of a corporation in which a spouse has a non-controlling separate property stock interest is not income from that separate property.

While the legal principles enunciated in *Speer* and *Simplot* are applicable here, this case is factually distinguishable from *Speer* and *Simplot*. In *Simplot* the husband, prior to marriage, had acquired a non-controlling separate property stock interest in the Apex Corporation, the parent corporation of the J.R. Simplot Company, which he retained during the marriage and after the marriage was terminated. The issue in that case was whether or not the community acquired an interest in the separate property stock as a result of both the Apex Corporation and the J.R. Simplot Company retaining as working capital all profits earned during the marriage. In *Speer* the husband acquired a controlling amount of stock in Speer, Inc., by gift from his parents during the marriage. Under I.C. § 32–903 the stock was clearly separate property when acquired. During the marriage Speer, Inc., never distributed any earnings as dividends. All earnings were retained as working capital and invested in inventory, equipment and raw materials. This Court held in both cases that the divorced spouse gained no interest in the husband's separate property stock as the result of the corporation retaining its profits as working capital rather than distributing them as dividends.

In the present case Charles acquired both stock and debentures in the corporation during the marrige from what had originally been his separate property partnership interest. However, as we have held in Part II(a), that partnership interest was enhanced as the result of approximately $75,760.00 of undistributed profits of the partnership which, contrary to the holding of the trial court, we have concluded to be income from the husband's separate partnership property within the meaning of I.C.

§ 32–906, and thus community property. The property transferred by Charles in exchange for both the stock and debentures partook of both his original separate property interest in the partnership and the retained earnings which we have held in Part II(a) to be community property. In situations such as this, the measure of the community's reimbursement was first set out in *Gapsch v. Gapsch*, 76 Idaho 44, 277 P.2d 278 (1954) as follows:

"As a general rule where the separate property of the husband is improved or his equity therein enhanced by community funds the community is entitled to be reimbursed from such separate estate unless such funds used for improvement or enhancement are intended as a gift. The claim for reimbursement has been held to be in the nature of a charge or an equitable lien against such separate property so improved or the equity of the husband therein enlarged. It would appear that the measure of the compensation generally is the increased value of the property due to the improvement; in instances where his equity therein has been increased through the application of community funds to the payment of the debt thereon the measure should be the amount by which such equity is enhanced." 76 Idaho at 53, 277 P.2d at 283.

Later, in *Suter v. Suter*, 97 Idaho 461, 546 P.2d 1169 (1976), we stated, as quoted by the trial court herein:

"*The measure of reimbursement* for community expenditure on separate property *is the increase in value of the property attributed thereto, not the amount of value of the community's contributions.* In addition, the party claiming reimbursement for community expenditure has the burden of demonstrating that there has been an enhancement of separate property due to those efforts or expenditures and the value of that increase." 97 Idaho at 465, 546 P.2d at 1173.

Since the trial court believed that the retained earnings of the partnership were separate rather than community property,

it made no finding as to the amount of the community property interest in the retained earnings of the partnership, or any "increase in the value of the [separate partnership] property attributed thereto...." 97 Idaho at 465, 546 P.2d at 1173.

■ Additionally, the trial court made no findings as to the market value of the partnership interest which Charles transferred to the corporation on March 1, 1979, in order to determine whether or not there was any increase in the value of the 4000 shares of stock and the $100,000 in debenture notes during the approximately fifteen months that Charles owned them. Furthermore, the trial court made no findings on whether or not any income which accrued on the $100,000 debenture notes owed by the corporation was paid to Charles. The income from such notes, whether paid or accrued, like income from the partnership whether paid or accrued, would constitute community property under I.C. § 32–906. The trial court in its decision did not address the issue of whether there was any interest income from the debenture notes.

Accordingly, on remand the trial court should first determine the interest of the community in Charles' otherwise separate property stock and debentures, resulting from the community interest in the partnership retained earnings which were invested in the stock and debentures along with Charles' separate property interest in that partnership, as set out in II(a) above. The trial court should then determine the interest of the community in the proceeds of the June 6, 1980, sale of the corporate stock and debenture notes. Also, the court should determine the community interest in the interest income accruing on the $100,000 debentures.

### III

The third issue resolved by the district court dealt with comingled assets. The magistrate had found that community property had been comingled with Charles' separate property bank account that was used jointly for the benefit of the community and, as a result, the separate property account was now community property. The district court ruled it was premature to rule on this issue until the magistrate conducted further proceedings and entered findings upon remand. The magistrate was ordered to determine whether taxes for the estate of Charles's first wife were paid out of community property. Additionally, the district court directed the magistrate to determine whether assets originally found to be community property by the magistrate were traceable to the separate bank account of Charles. Those issues and the community nature of the partnership retained earnings must be resolved on remand.

The magistrate found that throughout the course of the marriage both parties deposited all of their income and other cash receipts, from whatever source, in the one joint banking account which had originally been the separate property of Charles. One source of community income which appears to have been deposited in that joint account was that portion of the income of the Pepsi partnership which was distributed, rather than retained. The trial court's findings disclose that the income distributions from the partnership for the period from the marriage until the business was incorporated was the sum of $177,165. From this account, the parties not only paid all their living expenses, but Charles also paid the estate taxes on the estate of his deceased prior wife, his income tax obligations, including the income tax obligation of the parties, some of which would have been attributable to Charles' separate property income, and extensive personal loans to family friends, and investments in numerous securities. Based upon that record, the trial court found that:

"In all of the foregoing transactions regarding checking accounts of the parties, occurred during the marriage from a fund that was so comingled that the deposits lost their identity as to their community or separate nature and took on the identity of a community property fund. The plaintiff has attempted to trace the transactions using both direct tracing and accounting methods but has failed to reestablish the separate proper-

ty character of any of the loans made or debts paid out of the checking accounts. Therefore, this court is left with the conclusion that the estate tax debt of Velate was paid with community funds giving the defendant a right to reimbursement for one half of the community funds expended in discharging that debt and that all of the items of property acquired in the nature of the aforementioned bonds, checking account balance and loans made to the various individuals are community property."

These findings of the trial court are sustained by substantial evidence in the record. Nevertheless, since this case must be remanded to the magistrate to reconsider several property issues, including issues which may involve payments to or from that joint bank account, on remand the magistrate may reconsider the comingling issue and make any further findings of fact relating to those issues which are necessary to resolve all of the issues on remand.

## IV

The next issue argued on appeal to the district court was whether the couple's year-long reconciliation in 1981 created a common law marriage after the date of the partial summary judgment. Because the magistrate had ruled that the marriage was not terminated by the partial summary judgment, he did not finally resolve that issue. The district court remanded that issue to the magistrate to make a factual finding on whether a common law marriage took place. The district court stated, "If the trial court finds such a marriage took place, then it shall have to make a second determination on the characterization and valuation of property with respect to that period between the common-law marriage and the date of trial." We hold that the magistrate did not err when he concluded that the marriage was not dissolved by the partial summary judgment order, and so it was unnecessary for the magistrate to resolve the common law marriage issue be-

low. Accordingly, that portion of the district court's order is reversed.

## V

■ Finally, Isabel asserts as error the magistrate's conclusion that the $1,000 per month interim payments be offset against her share of the community property which would ultimately be awarded to her.

The magistrate ordered that:

"1. Plaintiff is directed to pay to defendant the sum of One Thousand and No/100 Dollars ($1,000.00) per month, with the first of such payments to be due on or before November 1, 1982, with a like payment to be paid on or before the first day of each and every month thereafter during the pendency of this action.

"2. All amounts paid to defendant pursuant to this order *shall be an offset against any amount of community property ultimately ordered to defendant* [Isabel]. If following trial of this matter, it appears that there is insufficient community property to cover the amount of the payments made under this order, the excess of the payments over the community property shall be considered as support payments made from plaintiff's property."

Isabel asserts that the trial court erred in offsetting the $1,000 per month award against her share of the community property to be distributed. She asserts that the award was temporary maintenance under I.C. § 32–704, and that under our decision in *Mifflin v. Mifflin*, 97 Idaho 895, 556 P.2d 854 (1976), and I.C. § 32–708,[10] such a maintenance award must be paid first from the community property prior to its division and distribution. We disagree.

In 1980, the Idaho statutes providing for maintenance and support were amended substantially. I.C. § 32–704, providing for temporary maintenance during the course of the action, was amended not only to eliminate the gender bias, but it was also amended to provide that such a temporary maintenance award was allowable, but only

---

10. **"32–708. What property liable.**—When implementing and construing sections 32–705 through 32–707, Idaho Code, the court must resort, first, to the community property, then to the separate property of either party.

"upon showing made in conformity with Section 32–705...." The same 1980 act added a new section, 32–705, dealing with permanent support (alimony) which set out three criteria which must be met before an award under that section could be made.

Under I.C. § 32–705 [11] an award of maintenance requires a finding by the trial court that the party being charged with maintenance is at "fault"; that the party claiming maintenance "lacks sufficient property to provide for his or her reasonable needs"; and the party seeking maintenance "is unable to support himself or herself through employment." In the present case, the magistrate did not find Charles to be at fault, and he further found that "the defendant can adequately see to her needs using her Social Security payments and moneys derived from the income or sale of property she is to receive from the dissolution of this marriage." Having made those findings, it is clear that Isabel was not entitled to maintenance under I.C. § 32–705, which would have been payable from the community property prior to division and distribution.

Since I.C. § 32–704,[12] the section under which Isabel is claiming, by its express terms requires the same showing as 32–705, the maintenance award did not qualify under I.C. § 32–704 because there was no showing of "fault," lack of assets, or inability to support herself by employment. Accordingly, the magistrate court was correct in treating the $1,000 monthly payment as a prejudgment distribution of a portion of the community property which would be awarded to Isabel, and offset those distributions against the final award. It is not uncommon in divorce situations for the community property, especially business type property, to remain in the possession of one of the spouses while the property issues are being either settled or litigated. To compensate for this unequal possession of the community property, where there is sufficient cash or other readily transferable community assets, it is appropriate for the trial court to make a temporary award such as in this case and provide that the payments shall be offset against the ultimate community property awarded to the receiving spouse. As the district court appropriately pointed out, it was the respondent Isabel who prepared the order and who accepted payments pursuant to the terms thereof.[13] The magistrate's order

---

11. "32–705. **Maintenance.**—1. Where a divorce is granted, for an offense of either spouse, including a divorce granted upon the complaint of the party at fault, the court may grant a maintenance order for the innocent spouse if it finds that the innocent spouse seeking maintenance:
  (a) Lacks sufficient property to provide for his or her reasonable needs; and
  (b) Is unable to support himself or herself through employment.
"2. The maintenance order shall be in such amounts and for such periods of time the court deems just, after considering all relevant factors which may include:
  (a) The financial resources of the spouse seeking maintenance, including the marital property apportioned to said spouse, and said spouse's ability to meet his or her needs independently;
  (b) The time necessary to acquire sufficient education and training to enable the spouse seeking maintenance to find employment;
  (c) The duration of the marriage;
  (d) The age and physical and emotional condition of the spouse seeking maintenance;
  (e) The ability of the spouse from whom maintenance is sought to meet his or her needs while meeting those of the spouse seeking maintenance;

  (f) The tax consequences to each spouse."

12. "32–704. **Allowance of support money, court costs and attorney fees—Representation of child.**—1. While an action for divorce is pending, the court may, in its discretion, on the motion of either party and upon showing made in conformity with section 32–705 or section 32–706, Idaho Code, whichever be appropriate, order the payment of temporary maintenance of either spouse by the other or temporary support of a child of the marriage, in amounts and on terms just and proper under the circumstances."

13. On appeal to the district court, it was ruled that the
  "Order for Temporary Maintenance by its terms made the award subject to an offset at the conclusion of the case. The actual form of the order was prepared by the respondent, and payments were accepted by her pursuant to its express terms. It is wholly disingenuous for the respondent to now challenge the award and its attendant conditions, and she is estopped from doing so. *Ross v. Ross, supra.*"

was a correct application of the law under the facts of this case, and the district court's decision affirming the magistrate was correct.

The district court's order is affirmed in part, reversed in part, and the cause remanded for further proceedings consistent with this opinion. No costs or attorney fees allowed.

DONALDSON, J., concurs.

SHEPARD, J., concurs in all but Part I.

HUNTLEY, J., concurs in all but Part II(b).

HUNTLEY, Justice, concurring specially.

I concur in the majority opinion as authored by Justice Bakes, but write to address one of the issues on appeal which his opinion totally fails to address or comment upon, that being Issue No. IIb which urges that the trial court erred in failing to hold that $39,171 in undistributed earnings of the Subchapter S Corporation constituted income to which the wife was entitled to a one-half interest as community property.

The record clearly establishes, and the trial court so found, that as of the date of the execution of the contract of sale of Mr. Swope's one-fourth interest in the corporation, there were undistributed earnings in that corporation of $39,171, upon which the parties had paid income tax.

That sale was made approximately seven months before the decree of divorce and the record establishes through Exhibit 15, the corporate tax return for the period from March 1, 1980 to February 28, 1981 (which period overlaps both the date of sale and the date of divorce) that there were cash assets in the corporation at the beginning of that fiscal year of $66,454.57 and at the end of that fiscal year of $212,741.95.

Although the parties presented that issue before the trial court, the district court

on appeal and ultimately this Court on the basis of being an issue of *how to treat undistributed corporate income* in light of *Simplot v. Simplot*, 96 Idaho 239, 526 P.2d 844 (1974), and *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974), a closer analysis indicates that neither those cases nor the concept of "retained corporate earnings" are germain to this case.

The real issue is what, if any, interest does the wife have in the *contract of sale* of the stock for $184,000, not what interest she has in the undistributed earnings of a corporation. This is true because at the time of the divorce, the husband did not own *the stock*, but rather, all he owned was a contract. When the husband sold his 25% of the corporate stock and debenture notes on June 6, 1980, he in effect exchanged all of his interest in the corporation, including the retained earnings, for the contract price of $840,000. Thus, as to Charles Swope, the execution of the contract in effect distributed the undistributed corporate earnings to him, that is, his one-fourth share thereof. Thus, the issue is not whether the wife has a right to undistributed earnings in a corporation, but whether the wife has a right to her one-half of the accumulated income in a corporation which has already been distributed by virtue of a sale of the husband's stock.

Accordingly, the trial court on remand should award the wife a one-half interest in the $39,171 [1] which the record clearly establishes was no longer *retained* earnings, because it became *distributed* earnings at the time of the execution of the contract of sale.

SHEPARD, Chief Justice, concurring and dissenting.

I concur in the opinion of the majority except as to Part I, wherein the majority reverses the district court which held that

---

1. Whether $39,171 is the precise figure or not must be the subject of further hearings on remand because the parties have not had opportunity to focus on the issue in the context of this concurring opinion. There is one factor which would tend to increase that number, that being

the effect of the ultimate findings as to the interest the community already obtained in the corporation by virtue of the retained earnings of the partnership, which earnings were used in part to fund the acquisition of the corporation.

the divorce was effective on the date of summary judgment.

The majority in Part I relies substantially on *Newell v. Newell*, 77 Idaho 355, 293 P.2d 663 (1956). As recognized by the district court in the instant case, *Newell* was overruled in *Ross v. Ross*, 103 Idaho 406, 648 P.2d 1119 (1982). The author of the majority in the instant case merely reiterates the argument set forth by Bakes, J., in his dissent in *Ross, supra.* It thus appears that the Court has come full circle now, overruling *Ross, supra,* and reinstating the earlier decision of *Newell, supra.*

The majority in the instant case attempts to distinguish the instant facts from the facts in *Ross* from which the Court there held that the principles of quasi-estoppel prevented the plaintiff in *Ross* from claiming error in the summary judgment granting the decree of divorce. In my view, in contrast to the assertions in the majority, this case cannot be distinguished from *Ross.* As in *Ross,* the defendant herein sought the divorce. As in *Ross,* the defendant here sought and received support from plaintiff, sought and received more than $3,000.00 attorney fees, and $1,300.00 in accounting fees. Defendant several times sought to have plaintiff held in contempt, and had execution issued upon plaintiff's assets. In my view the principles and holding of *Ross* are equally applicable in the instant case.

In concurring in the applicable portion of the *Ross* decision, Bistline, J., stated:

> Principles of judgment estoppel should suggest to any reasoning mind that a party may not invoke the processes of a court to acquire relief, and then appeal because of an entirely subjective desire that the relief awarded and sought should have been delayed until the exact time suitable to that party—that party desiring to use the withholding of the decree as an instrument of leverage. On that basis the bench, the bar, and especially the public, will be little troubled by our opinion today.
> . . . .

I am unable to understand why it is urged that we should be setting up roadblocks to a practice which has been followed for over twenty years, and which has well served the litigants and the practitioners.

BISTLINE, Justice, concurring only with part V, dissenting in Parts I and III, and not participating in Parts II, and IV.

The magistrate trial court, Judge Edwards, and the appellate district court Judge Hurlbutt, have facilitated and favored our appellate review with excellent decisions embodying the present status of Idaho case law, concerning which they differ only in application of the *Ross* decision. It will be a surprise to Judge Hurlbutt to find today that the *Ross* holding and philosophy is so quickly narrowed. Justice Bakes' opinion, in my view, *theorizes* what he thinks was in, or should have been running through, the mind of Judge Edwards when he denied certification—for which action I see no supporting rationale in the record.

Consistent with our majority opinion in *Ross v. Ross,* and consonant with the views expressed in my separate concurring opinion in *Ross*[1], I am in full agreement with Judge Hurlbutt's application of *Ross* to the circumstances of this case, differing only on one small point.

Judge Hurlbutt's appellate decision directed the magistrate to resolve Mrs. Swope's claim of a common law marriage of the parties after the entry of the partial summary judgment and before the trial on the contested property and support issues. In full agreement with his view, nevertheless, I seriously doubt that there is any authority for the proposition that a trial court can in a *single* action twice divorce a married couple—assuming that it very well may be determined that there was a common law marriage, which those who form a majority in Part I do. As the Court observed in *Eliasen*[2], if the evidence presented is sufficient to raise the presumption of marriage, the burden is shifted to the other

---

1. *Ross v. Ross,* 103 Idaho 406, 648 P.2d 1119 (1982).

2. *Matter of Eliasen,* 105 Idaho 234, 668 P.2d 110 (1983).

party to disprove the validity of the asserted common law marriage. 105 Idaho at 238, 668 P.2d at 114. The principal of law involved was well-stated in *Mauldin v. Sunshine Mining Co.*, 61 Idaho 9, 17, 97 P.2d 608, 611 (1939), and has been adhered to for now almost a half century without deviation in the slightest:

There is no showing that the parties entered into a meretricious relation at the inception of the relationship, but to the contrary there is the foregoing positive testimony relating to the inception of the relation strictly to the effect that the parties entered into a marriage relationship as man and wife. The rule adopted in this jurisdiction is that the law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy, every intendment of the law leans to matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of proof, the law raises a strong presumption of its legality, casting the burden of proof upon the party objecting and requiring him in every particular, to make plain, against the constant pressure of this presumption the truth of law and fact that the marriage is illegal and void. In *Smith v. Smith*, 32 Ida. 478, 185 Pac. 67, wherein this presumption is indulged the rule is stated as follows:

"The general rule, quoted by the supreme court of California from Bishop on Marriage, Divorce and Separation, is:

' "Every intendment of the law leans to matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of proof, the law raises a strong presumption of its legality; not only casting the burden of proof on the party objecting (1 Bishop on Mar. Div. & Sep. secs. 946–948), but requiring him throughout, in every particular, to make plain, against the constant pressure of this presumption, the truth of law and fact that it is illegal and void." Id. Sec. 956.' (*McKibbin v. McKibbin*, 139 Cal. 448, 73 Pac. 143.)

"Or as otherwise stated by the New York court of appeals in the following language, which has been frequently quoted with approval by more recent authorities:

' "The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presume morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence.' (*Hynes et al. v. McDermott et al.*, 91 N.Y.Supp. [N.Y.] 451, at 459, 43 Am. Rep. 677; *Sloan v. West*, 50 Wash. 86, 96 Pac. 684, 17 L.R.A. (N.S.) 960; *Bowman v. Little*, 101 Md. 273, 61 Atl. 223, 657, 1084; *Teter v. Teter*, 101 Ind. 129, 51 Am.Rep. 742; *Rooney v. Rooney*, 54 N.J.Eq. 231, 34 Atl. 682.)" (*Huff v. Huff, supra; Dawson v. United States*, 10 Fed. (2d) 106.)

Proof of marriage by the testimony of one of the parties has been specifically recognized by this court in *Labonte v. Davidson*, 31 Ida. 644, 175 Pac. 588, wherein it is said:

"The presumption of law is in favor of the validity of a marriage (*Huff v. Huff*, 20 Ida. 450, 118 Pac. 1080), and the direct testimony of respondents was sufficient to establish, *prima facie*, their relation of husband and wife. Marriage may be proven by the testimony of one of the parties. (*Watson v. Lawrence*, 134 La. 194, 63 So. 873, Ann.Cas. 1916A, 651, and note, L.R.A. 1915E, 121.)"

In addition to the testimony of appellant heretofore referred to there is considerable evidence of a mutual assumption of marital rights, duties and obligations, that the parties held themselves out to the world as husband and wife and cohabited together as such. The facts disclosed by the record did not permit of the presumption that the relationship of

appellant and John Mauldin was illicit in its inception, but rather the evidence was sufficient to establish their relationship of husband and wife, raising the strong presumption of its legality, and casting the burden of proof upon respondents to repel such presumption by the most cogent and satisfactory evidence.

The facts that the parties were once ceremonially married and lived together for a number of years, and no impediment existing which prevented a valid marriage, seemingly would erect an almost insurmountable burden of proof barrier which by law is cast "upon the party objecting." If, as would appear to be so, that the parties considered that they could thereby nullify the divorce which had been granted, nothing stood in the way of two competent people enjoying a second marriage, whether the law (the Supreme Court) considers that the divorce in this instance was interlocutory—at least up until the time one of the two might have married someone else.

The record in this case shows that as of October 14, 1982, Mr. Swope's claim for a divorce was predicated only upon grounds of irreconcilable·differences. Mrs. Swope's counterclaim for a divorce was similarly worded. On October 14, after Mr. Swope on his summary judgment motion was granted a divorce, as of January 2, 1981, the remaining issues were set for trial on June 1, 1981. The parties agreed to call off the trial and resume living together, and did to until just "several months" prior to October 24, 1982. From the 9th of February, 1981, until the 24th day of October 1982, almost 21 months, the file in the divorce action was wholly dormant. Activity therein only resumed when Mrs. Swope sought temporary support commencing with October of 1982. The last previous activity in February of 1981 was the initiation of contempt proceedings by Mrs. Swope to collect $1,000 of temporary support for that month of February 1981, allegedly due pursuant to an oral agreement of counsel. Thereafter Mrs. Swope filed an amended counterclaim for divorce in mid-November of 1982.

Apparently, the parties and the trial court were of the disposition that a pending divorce action may be used as a streetcar and the parties are free to get off and on at will. But that is not at all the way things should be done. If the parties did agree to call off the divorce action and go back together as husband and wife, as most assuredly is borne out by the record, they should have notified their attorneys, who in turn would have had the action dismissed. An ancient axiom here applicable is that equity considers done that which should have been done. Whereas Mrs. Swope filed an amended counterclaim, she should have initiated a new action to dissolve the second marriage, if indeed there was a reconciliation and resuming of a husband-wife relationship was *fait accompli.* When things went awry after a rather lengthy reconciliation and the streetcar was still running, so to speak, they jumped on. The only way to sensibly dispose of this appeal is to dismiss it with instructions to the trial court to enter a dismissal of the action if it concludes that the marriage relationship was resumed. The district court, if it does so conclude, is certainly entitled to set aside the divorce decree whether it be considered interlocutory as Justice Bakes contends, or simply subject to further consideration as the Court stated in *Ross.* Certainly there is no element of estoppel.

As what I hope is a final note, and not in anyway retreating from the foregoing, I am in agreement with the views of Huntley, J., which points to an important fallacy in the opinion authored by Bakes, J.